1

2

3

4

5

6                    **UNITED STATES DISTRICT COURT**

7                    **EASTERN DISTRICT OF CALIFORNIA**

8

9    LISA MARIA HERNANDEZ,                    Case No.  1:20-cv-01415-SKO

10                   Plaintiff,

11         v.                                 **ORDER ON PLAINTIFF'S SOCIAL
                                              SECURITY COMPLAINT**

12   KILOLO KIJAKAZI[1],                      (Doc. 1)
     Acting Commissioner of Social Security,
13

14                   Defendant.
     _____/
15

16

17                          **I.      INTRODUCTION**

18         On October 5, 2020, Plaintiff Lisa Maria Hernandez ("Plaintiff") filed a complaint under

19   U.S.C. §§ 405(g) and 1383(c) seeking judicial review of a final decision of the Commissioner of

20   Social Security (the "Commissioner" or "Defendant") denying her application for Supplemental

21   Security Income ("SSI") under Title XVI of the Social Security Act (the "Act").  (Doc. 1.)  The

22   matter is currently before the Court on the parties' briefs, which were submitted, without oral

23   argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[2]

24   ///

25

26   _____
     [1] On July 9, 2021, Kilolo Kijakazi was named Acting Commissioner of the Social Security Administration. *See*
     https://www.ssa.gov/history/commissioners.html.  She is therefore substituted as the defendant in this action.  *See* 42
27   U.S.C. § 405(g) (referring to the "Commissioner's Answer"); 20 C.F.R. § 422.210(d) ("the person holding the Office
     of the Commissioner shall, in [their] official capacity, be the proper defendant").
28   [2] The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 7, 8.)

## II.     BACKGROUND

Plaintiff protectively filed an application for SSI payment on August 7, 2017, alleging she became disabled on March 1, 2014, due to severe back pain, severe sleep apnea, extreme obesity with respiratory disorder, benign intracranial hypertension, secondary anemia, B12 anemia, iron deficiency anemia, and depression.  (Administrative Record ("AR") 88, 166, 178.)  Plaintiff was born on February 24, 1988, and was 26 years old as of the alleged onset date.  (AR 166, 188.)  She graduated high school and has no past work experience.  (AR 179.)

### A.     Relevant Medical Evidence[3]

#### 1.     Amardeep Aulakh, D.O.

On May 23, 2016, Plaintiff presented to Dr. Aulakh for a hematology/oncology consultation regarding her anemia.  (AR 479, 613.)  Dr. Aulakh noted that Plaintiff's primary care physician had been treating Plaintiff with oral iron replacement, but Plaintiff had not been compliant.  (AR 480, 614.)  "Given the severity of [Plaintiff's] anemia," Dr. Aulakh set forth a plan to treat Plaintiff with intravenous iron replacement.  (AR 480, 614.)  Upon examination, Dr. Aulakh found that Plaintiff had pain in her back and left knee but no joint swelling, redness, or decreased range of motion.  (AR 479.)  Plaintiff also had normal gait and muscle strength "without obvious weakness."  (AR 480.)

On June 19, 2017, Plaintiff presented for a follow-up visit for her anemia.  (AR 475.)  Dr. Aulakh noted that Plaintiff had been "lost to follow up since May 2016," when Plaintiff was scheduled for intravenous iron treatment but failed to show up.  (AR 475.)  Plaintiff received her first round of iron infusions on July 10, 2017, and July 17, 2017, after which her hemoglobin level increased from 6.8g to 11.1g.  (AR 466, 470, 603.)  At another follow-up appointment on November 14, 2017, Plaintiff reported feeling tired but denied any headaches, dizziness, or occasional blurry vision.  (AR 466, 599.)  Dr. Aulakh noted that "[m]ost of [Plaintiff's] anemia related symptoms ha[d] resolved."  (AR 467, 600.)  Treatment notes recorded that Plaintiff had normal range of motion, strength, and muscle tone.  (AR 467.)

---

[3] Because the parties are familiar with the medical evidence, it is summarized here only to the extent relevant to the contested issues.

1    On March 5, 2019, Plaintiff presented for a follow-up regarding her anemia.  (AR 464, 588.)

2    Treatment notes indicate that Plaintiff had been "a no-show since October 2017" and Plaintiff's

3    hemoglobin level had decreased to 6.7g.  (AR 464, 465, 588, 590.)  Dr. Aulakh scheduled Plaintiff

4    to receive a second round of intravenous iron infusions, which she received on March 14, 2019, and

5    March 21, 2019.  (AR 458, 461, 465, 582, 585.)  Following the infusions, Dr. Aulakh noted that

6    Plaintiff was feeling well and denied any acute complaints, and that Plaintiff's hemoglobin level

7    had increased from 6.7g to 8.4g.  (AR 458, 582.)  Upon examination, Plaintiff had normal range of

8    motion, strength, and muscle tone.  (AR 459, 462.)

9            **2.      Fresno Medical Center**

10    On April 19, 2017, Plaintiff complained of a headache.  (AR 290.)  Treatment notes recorded

11    that Plaintiff had undergone a CT scan of her head, which was negative for any acute intracranial

12    process but positive for chronic sinus disease.  (AR 291.)  The notes also indicated that Plaintiff had

13    complained of "occasional headaches" with sinus congestion flareups.  (AR 291.)

14    On December 4, 2017, Plaintiff presented for a follow-up appointment regarding her anemia,

15    allergies, headaches, and seizure disorder.  (AR 690.)  Upon examination, Plaintiff was found to

16    have 5/5 motor strength bilaterally and normal range of motion.  (AR 692.)  There was no swelling,

17    redness, or tenderness in Plaintiff's joints.  (AR 688.)  Treatment notes from January 15, 2018,

18    January 29, 2018, May 9, 2018, June 11, 2018, February 12, 2019, March 12, 2019, May 28, 2019,

19    August 1, 2019, and September 5, 2019, recorded similar findings.  (AR 636, 644, 651, 659, 666,

20    672, 679, 684, 692.)  The notes also indicated that Plaintiff had failed to show up for multiple

21    appointments, and the attending provider discussed with Plaintiff about "being noncompliant with

22    treatment and management."  (AR 637.)

23            **3.      Loveneet Singh, M.D.**

24    On December 20, 2017, Plaintiff presented to Dr. Singh, a neurologist, complaining of

25    headaches and neurologic seizures.  (AR 757.)  Plaintiff had been prescribed Topomax, and she

26    reported that her headaches had improved.  (AR 757–58.)  Treatment notes from April 4, 2018,

27    August 22, 2018, and March 5, 2019, included similar notations.  (AR 745–46, 751–52, 754–55.)

28    ///

**4.      State Agency Physicians**

On September 7, 2017, I. Ocrant, M.D., a state agency physician, reviewed the record and assessed Plaintiff's physical residual functional capacity ("RFC").[4]  (AR 68–70.)  Dr. Ocrant opined that Plaintiff was limited to: occasionally lifting and carrying 10 pounds; standing and/or walking for a total of two hours; sitting for "[m]ore than 6 hours on a sustained basis in an 8-hour workday"; occasionally climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling; and never climbing lappers/ropes/scaffolds.  (AR 68–69.)  Dr. Ocrant further opined that Plaintiff should avoid concentrated exposure to hazards.  Dr. Ocrant noted that Plaintiff "clearly also has benign cranial [hypertension] treated [with] acetazolamide . . . . However, [Plaintiff] is not alleging a visual disturbance."  (AR 70.)   Upon reconsideration on November 28, 2017, another state agency physician, E. Christian, M.D., reviewed the record and affirmed Dr. Ocrant's findings.  (AR 83–85.)

**B.      Plaintiff's Adult Function Report**

On August 12, 2017, Plaintiff completed an adult function report describing how her impairments limited her activities.  (AR 214–222.)  Plaintiff indicated that she lived in an apartment with family, and she had difficulty performing tasks "like moving around lifting, and standing for a long period of time[.]"  (AR 214.)  On a normal day, Plaintiff wakes up when her alarm goes off, gets her children ready for school, uses the bathroom, and then goes to watch television while "trying to manage [her] back pain."  (AR 215.)  Plaintiff takes care of her children by setting an alarm for them, and Plaintiff's father helps her get the children ready and feeds them before school.  (AR 215.)  As a result of her impairments, Plaintiff is no longer able to lie down, walk long distances, or stand for a long period.  (AR 215.)  Plaintiff is able to prepare simple meals and perform "light cleaning," such as picking up after her children; she is unable to do yard work.  (AR 216.)  Plaintiff can drive

---

[4] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of eight hours a day, for five days a week, or an equivalent work schedule. TITLES II & XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, Social Security Ruling ("SSR") 96-8p (S.S.A. July 2, 1996).  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id*.  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, *inter alia*, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.' "  *Robbins v. Soc. Sec. Admin*., 466 F.3d 880, 883 (9th Cir. 2006).

when her back "doesn't hurt as much["]  (AR 217.)  She is also able pay her bills, count change, and use a checkbook/money order.  (AR 217.)  Her hobbies and interests include watching television and playing on her phone.  (AR 218.)

According to Plaintiff, her impairments affect her ability to squat, stand, walk, sit, kneel, and climb stairs.  (AR 219.)  She is unable to walk a short distance because of her back pain, headaches, and difficulty breathing.  (AR 219.)  Plaintiff indicated that she can walk for less than 10 minutes before needing to take a 30 to 45 minute break.  (AR 219.)

## C.    Administrative Proceedings

The Commissioner initially denied Plaintiff's application for SSI benefits on September 11, 2017, and again on reconsideration on December 8, 2017.  (AR 89, 100.)  Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 106.)  At the hearing on October 8, 2019, Plaintiff appeared with counsel and testified before an ALJ as to her alleged disabling conditions.  (AR 38, 41–56.)

### 1.    Plaintiff's Testimony

Plaintiff is approximately five feet three inches tall and weighs 378 pounds.  (AR 48.)  She testified that she completed high school and had never worked, other than volunteering.  (AR 41.)  Plaintiff had volunteered at DAV Thrift Stores for approximately three weeks in 2013, three days a week for five hours a day, stocking items.  (AR 41.)  According to Plaintiff, she is unable to work due to "so much pain" in her back and headaches that leave her unable to see.  (AR 42.)  Plaintiff gets headaches "all the time," and they "do[n't] go away."  (AR 42.)  Plaintiff testified that her doctor informed her that the cause of the headaches was fluid in her brain, which she has drained once every six or seven months.  (AR 53.)  Her headaches improve after each draining, but her condition worsens as time lapses.  (AR 53.)  For her back pain, Plaintiff has been receiving shots and taking narcotics.  (AR 42.)  As for her headaches, Plaintiff has been taking medication, which has been helping her condition.  (AR 42–43.)  Plaintiff had seizures when she was younger but no longer has them now.  (AR 43.)  Plaintiff's knees also hurt "all the time," and they "give out" once every couple of weeks, causing her to fall.  (AR 49.)

Plaintiff further testified she had problems with depression and anxiety due to her separation

from her husband, who had recently been released from prison.  (AR 43.)  Her husband was "a little violent," and Plaintiff had obtained a restraining order against him for her two children, who were seven and eight years old.  (AR 43.)  After her husband's release, Plaintiff started experiencing panic attacks.  (AR 50.)  Plaintiff takes medication to help with her anxiety and depression.  (AR 44.)  She has also been receiving mental health treatment.  (AR 51.)

Plaintiff testified that she also had anemia, for which she receives infusions every six months.  (AR 44.)  She also receives blood transfusions.  (AR 47.)  There was a period between 2017 and early 2019 when Plaintiff did not receive infusions despite needing them.  (AR 44–45.)  Plaintiff stated that she was "scared to go outside" because her husband's family was threatening her and wanted to "take the kids away."  (AR 45.)

According to Plaintiff, she has been unable to see for "a couple of years" and thus cannot drive.  (AR 45.)  She uses Lyft, a rideshare service, to get around.  (AR 45.)  On a typical day, Plaintiff watches television with her children, who are homeschooled by Plaintiff's father and sister.  (AR 45-46.)  The homeschooling came about because Plaintiff was unable to walk her children to school.  (AR 51.)  Plaintiff sometimes goes outside when she "feel[s] better," which is "rare."  (AR 48.)  Plaintiff's sister helps Plaintiff with paying bills online and ordering the car from Lyft when needed.  (AR 45, 46–47.)  Plaintiff does not go grocery shopping or do household chores.  (AR 47.)  Plaintiff "[m]icrowave[s] stuff" for food when she can get up.  (AR 47.)

Plaintiff testified that she uses a walker with a seat "all the time."  (AR 48.)  She can stand for only 15 to 20 minutes before she needs to sit down due to back pain.  (AR 49.)  Plaintiff can sit for about 45 minutes before she needs to stand up.  (AR 49.)  According to Plaintiff, she is unable to lie down, so she sleeps sitting up.  (AR 49.)  Due to her insomnia, she has to take two or three 45 minute naps every day.  (AR 52.)

### 2.    Vocational Expert's Testimony

The ALJ asked the Vocational Expert ("VE") to consider a person of Plaintiff's age, education, and work experience.  (AR 57.)  The VE was also to assume this person was limited to sedentary work with the following additional limitations: never climb ladders, ropes, or scaffolds, or crawl; occasionally climb ramps or stairs, balance, stoop, kneel, and crouch; and no exposure to

hazards such as unprotected heights and heavy mechanical machinery.  (AR 57.)  The VE testified that such a person could performs the sedentary jobs of clerical addresser, Dictionary of Operational Titles ("DOT") code 209.587-010, semi-conductor dies loader, DOT code 726.687-030, and touch-up screener in the printer circuit board industry, DOT 726.684-110, all with a specific vocational preparation ("SVP")[5] of 2.  (AR 57–58.)

In a second hypothetical, the ALJ asked the VE to consider the person described in the first hypothetical, but with the following additional limitations.  (AR 58.)  The person can: perform work that "needs little or no judgment to do simple duties that can be learned on the job in a short period of time of up to 30 days," with a reasoning level of no higher than two; sustain ordinary routines; understand, carry out, and remember simple instructions; use judgment in making simple work-related decisions; attend and concentrate for two-hour periods, totaling a normal eight-hour workday with usual work breaks; respond appropriately to supervision and co-workers; tolerate occasional interaction with the general public; and handle changes in a routine work setting.  (AR 58–59.)  The VE testified that such a person could perform the three jobs identified in the first hypothetical, in addition to the jobs of semiconductor bonder, DOT code 726.685-066, and call-out operator, DOT code 237.367-014, both with an SVP of 2.  (AR 59.)

In a third hypothetical, the ALJ asked the VE to consider the person described in the second hypothetical, with the additional limitation that the person would be absent from work four or more days per month due to headaches.  (AR 59.)  The VE testified that person would not be able to perform any work in the regional or national economy.  (AR 59.)

**D.     The ALJ's Decision**

In a decision dated December 3, 2019, the ALJ found that Plaintiff was not disabled, as defined by the Act.  (AR 19–30.)  The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 416.920.  (AR 21–30.)  The ALJ determined that Plaintiff had not engaged in substantial gainful activity since August 7, 2017, the application date (step one).  (AR 21.)  At step two, the

---

[5] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.  DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991).  Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation).  *Id.*

1   ALJ found Plaintiff's following impairments to be severe: seizure disorder, depressive disorder,

2   post-traumatic stress disorder, mild intellectual disability, degenerative disc disease of the lumbar

3   spine, and obesity.  (AR 21.)  Plaintiff did not have an impairment or combination of impairments

4   that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

5   Appendix 1 ("the Listings") (step three).  (AR 22.)

6   The ALJ then assessed Plaintiff's RFC and applied the RFC assessment at steps four and

7   five.  *See* 20 C.F.R. § 416.920(a)(4) ("Before we go from step three to step four, we assess your

8   residual functional capacity . . . . We use this residual functional capacity assessment at both step

9   four and step five when we evaluate your claim at these steps.").  The ALJ determined that Plaintiff

10  had the RFC:

11      to perform sedentary work as defined in 20 CFR [§] 416.967(a) except [Plaintiff] can
        never climb ladders, ropes, or scaffolds.  [Plaintiff] can occasionally climb ramps or
12      stairs, balance, stoop, kneel, crouch, but never crawl.  [Plaintiff] cannot tolerate any
        exposure to hazards such as unprotected heights and heavy mechanical machinery
13      like a jackhammer or tractor.  [Plaintiff] can perform work that needs little or no
        judgment to do simple duties that can be learned on the job in a short period of time
14      up to 30 days and has a reasoning level of no higher than 2.  [Plaintiff] can sustain
        ordinary routines, understand, carry out and remember simple instructions and use
15      judgment in making simple work related decisions.  [Plaintiff] can attend and
        concentrate for two-hour periods totaling a normal eight hour workday with usual
16      work breaks.  [Plaintiff] can respond appropriately to supervision and coworkers, and
        can tolerate occasional interaction with the general public.  [Plaintiff] can deal with
17      changes in a routine work setting.

18  (AR 25.)  Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected

19  to cause the alleged symptoms[,]" the ALJ rejected Plaintiff's subjective testimony as "not entirely

20  consistent with the medical evidence and other evidence in the record."  (AR 26.)

21  The ALJ determined that Plaintiff had no past relevant work (step four).  (AR 29.)  The ALJ

22  ultimately concluded that, given her RFC, Plaintiff was not disabled because Plaintiff could perform

23  a significant number of other jobs in the national economy, specifically clerical addressor, loader

24  semiconductor, touchup screener, semiconductor bonder, and callout operator (step five).  (AR 29–

25  30.)

26  On December 12, 2019, Plaintiff sought review of the ALJ's decision before the Appeals

27  Council.  (AR 11.)  On July 30, 2020, the Appeals Council denied review.  (AR 5.)  Therefore, the

28  ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 416.1481.

# III.    LEGAL STANDARDS

## A.    Applicable Law

An individual is considered "disabled" for purposes of disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). However, "[a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* at § 1382c(a)(3)(B).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520); *see also* 20 C.F.R. § 416.920. The Ninth Circuit has provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity. If so, the claimant is not disabled. If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments. If not, the claimant is not disabled. If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1. If so, the claimant is automatically presumed disabled. If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing her past relevant work. If so, the claimant is not disabled. If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy. If so, the claimant is not disabled. If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see also* 20 C.F.R. § 416.920(a)(4) (providing the "five-step sequential evaluation process" for SSI claimants). "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520); 20 C.F.R. § 416.920.

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir.

9

1  1989)).  "However, if a claimant establishes an inability to continue [his] past work, the burden

2  shifts to the Commissioner in step five to show that the claimant can perform other substantial

3  gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

4      **B.    Scope of Review**

5      "This court may set aside the Commissioner's denial of [social security] benefits [only] when

6  the ALJ's findings are based on legal error or are not supported by substantial evidence in the record

7  as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted).  "Substantial evidence" means "such

8  relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

9  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305

10 U.S. 197, 229 (1938)).  "Substantial evidence is more than a mere scintilla but less than a

11 preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).

12     "This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec.

13 Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).  The ALJ's decision denying benefits "will be disturbed

14 only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell

15 v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  Additionally, "[t]he court will uphold the ALJ's

16 conclusion when the evidence is susceptible to more than one rational interpretation." *Id.*; *see, e.g.*,

17 *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) ("If the evidence is susceptible to more

18 than one rational interpretation, the court may not substitute its judgment for that of the

19 Commissioner." (citations omitted)).

20     In reviewing the Commissioner's decision, the Court may not substitute its judgment for that

21 of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  Instead, the Court must

22 determine whether the Commissioner applied the proper legal standards and whether substantial

23 evidence exists in the record to support the Commissioner's findings.  *See Lewis v. Astrue*, 498 F.3d

24 909, 911 (9th Cir. 2007).  Nonetheless, "the Commissioner's decision 'cannot be affirmed simply

25 by isolating a specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa

26 v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)).  "Rather, a court must 'consider the record as a

27 whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's]

28 conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

1    Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless."

2    *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*,

3    454 F.3d 1050, 1055–56 (9th Cir. 2006)).  Harmless error "exists when it is clear from the record

4    that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tommasetti*

5    *v. Astrue*, 533 F.3d 1035, 1038 (9th Circ. 2008) (quoting *Robbins v. Social Sec. Admin.*, 466 F.3d

6    880, 885 (9th Cir. 2006)).  "[T]he burden of showing that an error is harmful normally falls upon

7    the party attacking the agency's determination."  *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)

8    (citations omitted).

9                                    **IV.    DISCUSSION**

10    Plaintiff contends that the ALJ harmfully erred in two ways.  First, the ALJ erred at step two

11    by finding her anemia and pseudoutumor cerebri nonsevere.  (*See* Doc. 19 at 33–36.)  Second, the

12    ALJ erred in rejecting Plaintiff's testimony about her pain and symptoms.  (*See* Doc. 19 at 36–40.)

13    For the reasons explained below, the Court finds that the ALJ did not err.

14           **A.    The ALJ Did Not Harmfully Err at Step Two**

15                  **1.    Legal Standard**

16    "At step two of the five-step sequential inquiry, the Commissioner determines whether the

17    claimant has a medically severe impairment or combination of impairments."  *Smolen v. Chater*, 80

18    F.3d 1273, 1289–90 (9th Cir. 1996) (citing *Bowen v. Yuckert*, 482 U.S. 137, 140–41 (1987)).  "[A]t

19    the step two inquiry, . . . the ALJ must consider the combined effect of all of the claimant's

20    impairments on her ability to function, without regard to whether each alone was sufficiently

21    severe."  *Id.* at 1290 (citing 42 U.S.C. § 423(d)(2)(B) and Titles II & XVI: The Sequential

22    Evaluation Process, Social Security Ruling ("SSR") 86-8 (S.S.A. 1986)).

23    "[A]n impairment is not severe if it does not significantly limit [the claimant's] . . . ability

24    to do basic work activities."  *Smolen*, 80 F.3d at 1290 (citing 20 C.F.R. §§ 404.1520(c) &

25    404.1521(a)).  "[B]asic work activities are the abilities and aptitudes necessary to do most jobs."

26    Titles II & XVI: Med. Impairments That Are Not Severe, SSR 85-28 (S.S.A. 1985).  Examples

27    of "basic work activities" include (1) "[p]hysical functions such as walking, standing, sitting, lifting,

28    pushing, pulling, reaching, carrying, or handling," (2) "[c]apacities for seeing, hearing, and

speaking," (3) "[u]nderstanding, carrying out, and remembering simple instructions," (4) "[u]se of judgment," (5) "[r]esponding appropriately to supervision, co-workers and usual work situations," and (6) "[d]ealing with changes in a routine work setting." 20 C.F.R. § 416.922(b).

"An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an [individual's] ability to work.'" *Smolen*, 80 F.3d at 1290 (quoting SSR 85–28). Additionally, "an ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his conclusion is 'clearly established by medical evidence.'" *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005) (citing SSR 85–28); *cf. Ukolov v. Barnhart*, 420 F.3d 1002, 1006 (9th Cir. 2005) (finding that the claimant "failed to meet his burden of establishing disability" where "none of the medical opinions included a finding of impairment, a diagnosis, or objective test results").

"Great care should be exercised in applying the not severe impairment concept." SSR 85–28. "The Commissioner has stated that '[i]f an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation should not end with the not severe evaluation step.'" *Webb*, 433 F.3d at 687 (alteration in original) (quoting SSR 85–28).

Ultimately, "[t]he severity regulation increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account." *Brown v. Yuckert*, 482 U.S. 137, 153 (1987). In other words, "the step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen*, 80 F.3d at 1290 (*citing Yuckert*, 482 U.S. at 153–54). Nonetheless, "[t]he plaintiff has the burden of establishing the severity of the impairment." *Cookson v. Comm'r of Soc. Sec.*, No. 2:12–cv–2542–CMK, 2014 WL 4795176, at *2 (E.D. Cal. Sept. 25, 2014)

### 2.   Analysis

At step two of the sequential evaluation process, the ALJ determined that Plaintiff's anemia and pseudotumor cerebri (intracranial hypertension) were nonsevere. (AR 21.) With regard to the former, the ALJ explained that Plaintiff's iron deficiency anemia was "improved when [Plaintiff]

[wa]s compliant with treatment." (AR 21.) The medical records cited by the ALJ (*see* AR 21) indicate that Plaintiff initially presented to Dr. Aulakh in May 2016 for a hematology/oncology consultation regarding her anemia, at which time Dr. Aulakh set forth a plan to treat Plaintiff with intravenous iron replacement. (AR 479, 480, 613, 614.) Plaintiff, however, failed to show up for treatment for over year, until she presented for a follow-up in June 2017. (*See* AR 475.) Treatment notes indicate that, after Plaintiff eventually received her first round of iron infusions on July 10, 2017, and July 17, 2017, her hemoglobin level increased from 6.8g to 11.1g. (AR 466, 470, 603.) In November 2017, Plaintiff reported feeling tired but denied any headaches, dizziness, or occasional blurry vision, and Dr. Aulakh noted that "[m]ost of [Plaintiff's] anemia related symptoms ha[d] resolved." (AR 466, 467, 599, 600.) The record further indicates that Plaintiff did not seek treatment for her anemia again until March 2019, nearly a year and a half later, at which point her hemoglobin level had decreased to 6.7g. (AR 464, 465, 588, 590.) After Plaintiff received a second round of iron infusions in March 2019, Dr. Aulakh noted that Plaintiff was feeling well and denied any acute complaints, and that Plaintiff's hemoglobin level had increased from 6.7g to 8.4g. (AR 458, 461, 582, 585.)

As the record supports that Plaintiff's anemia symptoms improved when Plaintiff was compliant with treatment, the ALJ reasonably determined that Plaintiff's anemia was a non-severe impairment. *See Beck v. Astrue*, 303 F. App'x 455, 457 (9th Cir. 2008) (holding that the ALJ properly found impairment non-severe because claimant failed to follow recommended treatment plan, and the record showed that with treatment, the impairment would be controlled effectively) (citing *Warre v. Comm'r of Soc. Sec.*, 439 F.3d 1001, 1006 (9th Cir. 2006) (holding that an impairment that can be controlled effectively is not disabling for social security purposes)); *Fry v. Comm'r of Soc. Sec.*, No. 2:15–cv–2023–KJN (PS), 2017 WL 999459, at *3 (E.D. Cal. Mar. 15, 2017) (the ALJ properly found the plaintiff's plantar fasciitis to be non-severe where the plaintiff acknowledged that the condition improved when he used orthotic inserts). Even if the record evidence could be construed more favorably to Plaintiff, as she suggests (*see* Doc. 19 at 34), the Court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner and will not disturb the ALJ's finding on this basis. *See Robbins*, 466 F.3d at 882; *Thomas v.*

*Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) ("Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld"); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004) ("When evidence reasonably supports either confirming or reversing the ALJ's decision, we may not substitute our judgment for that of the ALJ.").

As for Plaintiff's benign intracranial hypertension and pseudotumor cerebri, the ALJ determined that those conditions "d[id] not appear to cause [Plaintiff] any problems or symptoms." (AR 21.)  Related to these diagnoses are Plaintiff's migraines and chronic nonintractable headaches, which the ALJ also found to be nonsevere because imaging studies were negative for any acute intracranial process and recent neurology records indicated that the headaches were improving.  (AR 21.)  Specifically, treatment notes indicate that a CT scan of Plaintiff's head was negative for any acute intracranial process, but positive for chronic sinus disease, and Plaintiff had "occasional headaches" with sinus congestion flareups.  (AR 291.)  Treatment notes from December 2017, April 2018, August 2018, and March 2019 recorded that Plaintiff's headaches improved with the use of Topamax (AR 745–46, 751–52, 754–55, 757–58), which is consistent with Plaintiff's own testimony (*see* AR 43).  Additionally, two state agency physicians, whose opinions the ALJ found persuasive (AR 27–28), considered Plaintiff's benign intracranial hypertension and did not find it to be severe, noting that the condition was being treated with acetazolamide and that Plaintiff was "not alleging a visual disturbance."[6]  (AR 70, 85.)

Plaintiff contends that the ALJ failed to consider Plaintiff's testimony in assessing the severity of her anemia and pseudotumor cerebri.  (*See* Doc. 19 at 35.)  An ALJ, however, need not believe every allegation of disabling pain or functional limitation advanced by a claimant.  *See Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995).  For the reasons explained below (*see infra* Section IV.B), the Court finds that the ALJ properly rejected Plaintiff's testimony regarding her limitations.

---

[6] Plaintiff contends that one of the state agency physicians, Dr. Ocrant, "highlighted the significance of visions problems in his opinion" (Doc. 19 at 35), but it is unclear to the Court how this contention is supported by Dr. Ocrant's statement that Plaintiff "[is] *not* alleging a visual disturbance."  (AR 70 (emphasis added).)

1    Based upon the record, the Court concludes that substantial evidence supports the ALJ's

2  finding that Plaintiff's anemia and pseudotumor cerebri were not severe enough to have more than

3  a minimal effect on her ability to work.  Therefore, the ALJ did not err by finding those impairments

4  nonsevere at step two.

5         **3.     Harmless Error**

6    Even assuming that the ALJ erred in finding Plaintiff's anemia and pseudotumor cerebri

7  nonsevere, Plaintiff has the burden of establishing that any error resulted in actual harm.  *See Ludwig*

8  *v. Astrue*, 681 F.3d 1047, 1054–55 (9th Cir. 2012).  An "ALJ's error is harmless where it is

9  inconsequential to the ultimate nondisability determination."  *See Molina*, 674 F.3d at 1115

10 (quotation marks and citations omitted).  Even assuming the ALJ erred in finding Plaintiff's anemia

11 and pseudotumor cerebri to be nonsevere, the error was harmless because Plaintiff failed to identify

12 additional limitations caused by those impairments that the ALJ should have included in their RFC

13 determination.  *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008);

14 *Stout*, 454 F.3d at 1055 (error harmless where it is non-prejudicial to claimant or irrelevant to the

15 ALJ's ultimate disability conclusion); *Frazier v. Colvin*, No. CV–13–270–JPH, 2014 WL 943137,

16 at *5 (E.D. Wash. Mar. 11, 2014) (finding that "any error at step two is harmless here because

17 Frazier fails to identify any more restrictive limitations caused by fatigue").  Indeed, here, the ALJ

18 determined that Plaintiff had the RFC to perform sedentary work, the most restrictive of all work

19 categories, with significant additional restrictions.  (*See* AR 25.)

20    Citing to an unpublished Ninth Circuit decision, *Ortiz v. Comm'r of Soc. Sec.*, 425 F. App'x

21 653, 655 (9th Cir. 2011), Plaintiff contends that remand for further proceedings is warranted, should

22 the Court find error at step two.  (*See* Doc. 19 at 36.)  But *Ortiz* is distinguishable, as the ALJ in that

23 case made a determination of nondisability at step two, finding that the claimant did not suffer from

24 any severe impairments.  *Ortiz*, 425 F. App'x at 654.  By contrast, the ALJ here resolved step two

25 in Plaintiff's favor, finding that she had several severe impairments.  (*See* AR 21.)  The Ninth Circuit

26 has held that when the ALJ has resolved step two in a claimant's favor, any error in designating

27 specific impairments as severe at that step does not necessarily prejudice a claimant.  *See, e.g.*, *Buck*

28 *v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017) ("[S]tep two was decided in [the plaintiff's] favor

1  after both hearings.  He could not possibly have been prejudiced.  Any alleged error is therefore

2  harmless and cannot be the basis for a remand.") (citation omitted).

3        In sum, the Court concludes that the ALJ did not harmfully err in finding Plaintiff's anemia

4  and pseudotumor cerebri nonsevere.

5        **B.**     **The ALJ Did Not Err in Evaluating Plaintiff's Testimony**

6        **1.**     **Legal Standard**

7        In evaluating the credibility of a claimant's testimony regarding her impairments, an ALJ

8  must engage in a two-step analysis.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  First,

9  the ALJ must determine whether the claimant has presented objective medical evidence of an

10  underlying impairment that could reasonably be expected to produce the symptoms alleged.  *Id.*  The

11  claimant is not required to show that their impairment "could reasonably be expected to cause the

12  severity of the symptom she has alleged; she need only show that it could reasonably have caused

13  some degree of the symptom."  *Id.* (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir.

14  2007)).  If the claimant meets the first test and there is no evidence of malingering, the ALJ can only

15  reject the claimant's testimony about the severity of the symptoms if they give "specific, clear and

16  convincing reasons" for the rejection.  *Id.*  As the Ninth Circuit has explained:

17
18
19
20
21
> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.  If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

22  *Tommasetti*, 533 F.3d at 1039 (citations and internal quotation marks omitted); *see also Bray v.*

23  *Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226–27 (9th Cir. 2009).  Other factors the ALJ may

24  consider include a claimant's work record and testimony from physicians and third parties

25  concerning the nature, severity, and effect of the symptoms of which he complains.  *Light v. Social*

26  *Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

27        The clear and convincing standard is "not an easy requirement to meet," as it is "'the most

28  demanding required in Social Security cases.'"  *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir.

2014) (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).  General findings are not sufficient to satisfy this standard; the ALJ "'must identify what testimony is not credible and what evidence undermines the claimant's complaints.'"  *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)).

## 2. Analysis

Plaintiff contends that the ALJ failed to provide a clear and convincing reason, supported by substantial evidence, for discounting her testimony.  (Doc. 19 at 37–40.)  As an initial matter, the Court observes that the ALJ did not completely reject Plaintiff's testimony that her impairments limited her ability to work, ultimately assessing that Plaintiff had an RFC to perform less than the full range of sedentary work, which is the most restrictive exertional category.  (*See* AR 25, 26.) The ALJ recognized that Plaintiff's obesity "significantly limits her ability to engage and work activity" and causes her to "experience[] greater pain and functional limitations than might be expected" from her other impairments.  (AR 26.)

Ultimately, the ALJ determined that the record did not support the full extent of Plaintiff's alleged limitations, rejecting those beyond the ones identified in the ALJ's RFC determination.  (AR 26.)  As the ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," the ALJ was required to provide "specific, clear and convincing reasons" to reject the additional limitations alleged by Plaintiff.  *See Vasquez*, 572 F.3d at 591.  Here, the ALJ properly discounted Plaintiff's testimony because her alleged limitations were unsupported by the objective medical evidence of record and her activities of daily living.  (AR 25–26.)

### a. Objective Evidence of Record

"[T]he Ninth Circuit has repeatedly emphasized that, 'in evaluating the credibility of . . . testimony after a claimant produces objective medical evidence of an underlying impairment, an ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of [the impairment].' "  *Ondracek v. Comm'r of Soc. Sec.*, No. 1:15–cv–01308–SKO, 2017 WL 714374, at *8 (E.D. Cal. Feb. 22, 2017) (quoting *Burch*, 400 F.3d at 680); *see, e.g.*, *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (a claimant's

1    testimony "cannot be rejected on the sole ground that it is not fully corroborated by objective

2    medical evidence).  Nonetheless, "lack of medical evidence . . . is a factor that the ALJ can consider

3    in h[er] credibility analysis."  *Burch*, 400 F.3d at 681.

4        The ALJ discounted Plaintiff's testimony regarding her "allegations of disabling symptoms

5    and limitations," including that Plaintiff can stand for only 15 to 20 minutes at one time due to her

6    back pain, in part because Plaintiff's complaints were unsupported by the medical evidence.  (AR

7    25–27.)  The ALJ provided sufficient support for this conclusion, identifying ample unremarkable

8    findings.  (*See* AR 26–27.)  For example, treatment notes from May 2016 through September 2019

9    consistently recorded that Plaintiff had gait within normal limits, in addition to normal

10   musculoskeletal range of motion, strength, tone, and reflexes.  (*See* AR 459, 462, 467, 469, 479–80,

11   636, 644, 651, 659, 666, 672, 679, 684, 688, 692.)  The ALJ also noted that Plaintiff had not been

12   compliant with treatment for her impairments, as she failed to show up for scheduled appointments

13   multiple times (AR 27, 637).  *See Molina*, 674 F.3d at 1112 (an ALJ may consider an unexplained

14   or inadequately explained failure to seek treatment or to follow a prescribed course of treatment).

15       Based on the record, the ALJ reasonably concluded that the medical evidence provided

16   support for severe limitations—as reflected in the ALJ's RFC determination limiting Plaintiff to

17   sedentary work with additional restrictions—but not a total inability to work as alleged by Plaintiff.

18   Accordingly, the Court finds that the ALJ properly considered lack of support by the objective

19   evidence, in addition to other "clear and convincing" reasons, to discount Plaintiff's credibility.  *See*

20   *Salas v. Colvin*, No. 1:13–cv–00429–BAM, 2014 WL 4186555, at *6 (E.D. Cal. Aug. 21, 2014).

21                       **b.    Activities of Daily Living**

22       The ALJ also found that Plaintiff's daily activities indicated that her impairments were not

23   as severe as she reported them to be.  (AR 25–26.)  An ALJ can consider a claimant's activities that

24   undermine claims of totally disabling pain in making the credibility determination.  *See Fair v.*

25   *Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595,

26   600 (9th Cir. 1999); *Rollins*, 261 F.3d at 857; *see also Thomas*, 278 F.3d at 958–59.  If the claimant

27   is able to spend a substantial part of their day engaged in pursuits involving the performance of

28   physical functions that are transferable to a work setting, a specific finding as to this fact may be

sufficient to discredit an allegation of disabling excess pain.  *Fair*, 885 F.2d at 603.  "Even where the claimant's activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment."  *Molina*, 674 F.3d at 1113.

Here, the ALJ noted conflicting reports of Plaintiff's activities of daily living between Plaintiff's adult function report and Plaintiff's testimony.  (*See* AR 25–26.)  For example, Plaintiff asserted in her adult function report that she was able to do light cleaning, prepare simple meals, drive when her back does not bother her, shop via the computer, pay bills, count change, and use a checkbook/money order.  (AR 26, 216–17.)  At the hearing, however, Plaintiff testified that she is unable to drive or perform most household chores, and that she requires her sister's assistance to pay bills online because she does not know how to do so.  (AR 45–47.)  An ALJ's credibility finding may be based upon "ordinary techniques" of credibility evaluation, including inconsistent statements.  *See Smolen*, 80 F.3d at 1284; *Alonzo v. Colvin*, No. 1:14–cv–00460–SKO, 2015 WL 5358151, at *17 (E.D. Cal. Sept. 11, 2015) (finding that one inconsistent statement "comprised a clear and convincing reason to discount a claimant's credibility").

Ultimately, the ALJ appeared to assign greater weight to Plaintiff's statements in her adult function report, and determined that Plaintiff had "described daily activities [i.e., performing most activities of personal care, preparing simple meals, paying her bills, and getting along with others] which are inconsistent with her complaints of disabling symptoms and limitations."  (AR 26.)  The record also indicates that Plaintiff lives alone with her two young children, whom she cares for and homeschools with the assistance of her father and sister.  (AR 46, 214.)  Based on the record, the Court finds that Plaintiff's activities were reasonably considered by the ALJ to be inconsistent with her alleged inability to work due to the severity of her symptoms.  Even if some of these activities do not rise to the level of transferable work skills, as Plaintiff suggests (*see* Doc. 19 at 38–39), they are, as a whole, inconsistent with allegations of completely debilitating impairment.  *Molina*, 674 F.3d at 1113.  Accordingly, the inconsistency between Plaintiff's activity level and her complaints was a clear and convincing reason to find her testimony not credible.  *See* 20 C.F.R. § 416.929(c)(3); *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008).

1    **3.    Harmless Error**

2         Even assuming the ALJ erred in discounting Plaintiff's testimony, the error was harmless

3    because it is unclear what functional limitations Plaintiff believes her testimony established that

4    were not accounted for in the ALJ's RFC assessment.  Plaintiff does not identify what portion of

5    her testimony the ALJ should have credited or what additional limitations should have been included

6    in her RFC, nor does she explain how the ALJ's RFC determination is inconsistent with her

7    testimony.  (*See* Doc. 19 at 37–40.)  *See Carmickle*, 533 F.3d at 1162; *Stout*, 454 F.3d at 1055.  As

8    discussed above, the ALJ determined that Plaintiff had the RFC to perform sedentary work, the most

9    restrictive of all work categories, with significant additional restrictions.  (*See* AR 25).  Therefore,

10   the Court concludes that the ALJ did not harmfully err in their evaluation of Plaintiff's testimony.

11                          **V.    CONCLUSION AND ORDER**

12        Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial

13   evidence and is therefore AFFIRMED.  The Clerk of this Court is DIRECTED to enter judgment in

14   favor of Defendant Kilolo Kijakazi, Acting Commissioner of Social Security, and against Plaintiff

15   Lisa Marie Hernandez.

16

17   IT IS SO ORDERED.

18   Dated:   __**March 17, 2022**__              _____/s/ *Sheila K. Oberto*_____
19                                               UNITED STATES MAGISTRATE JUDGE

20

21

22

23

24

25

26

27

28